Kristy M. Arevalo, State Bar No. 216308
kma@mccunelawgroup.com
**MCCUNE LAW GROUP**
3281 East Guasti Road, Ste. 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Attorney for Plaintiffs, Yuliya Korchnoy and Andrey Korchnoy

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

YULIYA KORCHNOY, an individual; ANDREY KORCHNOY, an individual;

Plaintiffs,

vs.

BAYER CORPORATION, an Indiana corporation; BAYER HEALTHCARE PHARMACEUTICALS, INC., a Delaware corporation; BAYER HEALTHCARE, LLC, a Delaware limited liability company; BERLEX LABORATORIES, INC., a Delaware corporation; BAYER SCHERING PHARMA AG, a German corporation; SCHERING AG, a German corporation; TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., BARR PHARMACEUTICALS LLC (formerly known as BARR PHARMACEUTICALS, INC.), BARR LABORATORIES, INC., and Does 1 -100, inclusive,

Defendants.

**CASE NO.:** '25CV0785 BAS MSB

**COMPLAINT FOR:**

1. **Fraudulent Concealment**
2. **Strict Liability**
3. **Breach of Implied Warranty of Merchantability**
4. **Breach of Implied Warranty of Fitness for a Particular Purpose**
5. **Negligent Failure to Warn**
6. **Negligence**
7. **Negligent Misrepresentation**
8. **Breach of Express Warranty**
9. **Fraudulent Misrepresentation**
10. **Civil Conspiracy and Commercial Bribery**
11. **Loss of Consortium**
12. **Punitive Damages**

**DEMAND FOR JURY TRIAL**

NOW COMES PLAINTIFFS, by and through the undersigned counsel, and for their Complaint hereby aver and state as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiffs for damages associated with ingestion of the pharmaceutical drug Yaz® and Ocella®, an oral contraceptive developed, designed, licensed, manufactured, distributed, sold, and/or marketed by Defendants.

2. As a result of the ingestion of Yaz® and Ocella®, Plaintiff Yuliya Korchnoy suffered injuries to her person including, but not limited to, a stroke in July of 2023.

## THE PARTIES

3. Plaintiff Yuliya Korchnoy, (herein "Plaintiff"), currently lives and at all times relevant to this complaint has lived in the city San Diego, California.

4. Plaintiff is married to Plaintiff Andrey Korchnoy, who also lives in the city of San Diego, State of California.

5. Defendant BAYER CORPORATION is, and at all times relevant was, a corporation organized under the laws of the State of Indiana with its headquarters and principal place of business at 100 Bayer Rd., Pittsburgh, Pennsylvania 15205.

6. Defendant BAYER HEALTHCARE LLC, is, and at all times relevant was, a limited liability corporation organized under the laws of the State of Delaware with its headquarters and principal place of business at 100 Bayer Road, Pittsburg, PA 15205.

7. Defendant BAYER HEALTHCARE LLC is wholly owned by Defendant BAYER CORPORATION.

8. Defendant BAYER PHARMACEUTICALS CORPORATION is, and at times relevant was, a corporation organized under the laws of the State of Delaware with its headquarters and principal place of business at 1400 Morgan Lane, West Haven, Connecticut.

9. As of January 1, 2008, Defendant BAYER PHARMACEUTICALS CORPORATION was merged into Defendant BAYER HEALTHCARE PHARMACEUTICALS INC.

10.Defendant BAYER HEALTHCARE PHARMACEUTICALS INC. is and at times relevant was, a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 340 Changebridge Road, P.O. Box 1000, Montville, New Jersey 07045-1000.

11.Defendant BAYER HEALTHCARE PHARMACEUTICALS INC., was formerly known as Berlex, Inc., which was formerly known as Berlex Laboratories, Inc., and is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

12.Defendant BAYER HEALTHCARE PHARMACEUTICALS INC. is the holder of approved New Drug Application ("NDA") for Yaz®.

13.Defendants BERLEX LABORATORIES, INC. and BERLEX, INC. are, and at all times relevant were, foreign corporations with their headquarters and principal places of business at Montville, New Jersey and with a post office address of P.O. Box 1000, Montville, New Jersey, 07045 and places of business located at 6 West Belt Road, Wayne, New Jersey 07470.

14.Defendants BERLEX LABORATORIES, INC. and BERLEX, INC., were integrated into Bayer HealthCare AG and operates as an integrated specialty pharmaceuticals business under the new name, Defendant Bayer Healthcare Pharmaceuticals, Inc.

15.Defendant BAYER SCHERING PHARMA AG, formerly known as Schering AG, is a pharmaceutical company that is organized and existing under the laws of the Federal Republic of Germany, having a principal place of business at Mullerstrasse 178, 13353 Berlin, Germany.

16.Defendant BAYER SCHERING PHARMA AG is a corporate successor to Schering AG.

17.SCHERING AG was renamed BAYER SCHERING PHARMA AG effective December 29, 2006.

18.Defendant BAYER SCHERING PHARMA AG'S headquarters and principal place of business in the United States is located at 100 Bayer Road, Pittsburgh, Pennsylvania, 15205.

19.Defendant BAYER SCHERING PHARMA AG is the current owner of the patent(s) relating to the oral contraceptive, Yaz®.

20.Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

21.Defendant BAYER AG is the third largest pharmaceutical company in the world.

22.Defendant BAYER AG is the parent/holding company of all other named Defendants.

23.Defendant BAYER AG's headquarters and principal place of business in the United States is located at 100 Bayer Road, Pittsburgh, Pennsylvania, 15205.

24.Defendant Bayer Corporation is the North American subsidiary of Defendant Bayer AG. Defendant Bayer Corporation encompasses the corporate-center functions that support Bayer subgroups in North America: Bayer Crop Science, Bayer Healthcare and Bayer Material Science.

25. Defendants Bayer Corporation, Bayer Healthcare LLC, Bayer Pharmaceuticals Corporation, Bayer Healthcare Pharmaceuticals, Inc., Bayer Schering Pharma AG, and Bayer AG shall be referred to herein individually by name or collectively as "Bayer" or "Bayer Defendants."

26.Defendant Barr Pharmaceuticals LLC, formerly known as Barr Pharmaceuticals, Inc. (collectively referred to as "BPI") is and at all times relevant was a corporation organized under the laws of the state of Delaware having regularly established places of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677; 109 Morgan

Lane, Plainsboro, New Jersey 08536; and 265 Livingston Street, Northvale, New Jersey 07647 with its principal place of business in Woodcliff Lake, New Jersey.

27.Defendant Barr Laboratories, Inc. ("BLI") is and at all times relevant was a corporation organized under the laws of the state of Delaware having regular and established places of business at One Belmont Avenue, Bala Cynwyd, Pennsylvania and 255 Summit Avenue, Montvale, New Jersey.

28.BLI was a wholly owned subsidiary of BPI.

29.Defendants BLI and BPI shall be referred to herein individually by name or collectively as "Barr" or "Barr Defendants."

30.Defendant Teva Pharmaceutical Industries Ltd ("Teva Ltd") is and at all relevant times was a pharmaceutical corporation organized under the laws of Israel maintaining its principal place of business at 5 Basel Street, Petah Tiqva 49131, Israel.

31.Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is and at all relevant times was a pharmaceutical company organized under the laws of Delaware with its principal place of business located at 18-01 River Road, Fairlawn, NJ 04410.

32.Defendant Teva USA is an indirect, wholly-owned subsidiary of Teva Ltd.

33.Defendants Teva Ltd. and Teva USA, shall be referred to herein individually by name or collectively as "Teva" or the "Teva Defendants."

34.Teva is among the top 20 pharmaceutical companies and among the largest generic pharmaceutical companies in the world.

35.On or about December 23, 2008, Teva acquired Barr and integrated Barr as a wholly owned subsidiary.

36.Teva USA through BLI distributes the generic form of Yasmin® in the U.S. under the Barr Laboratories label, Ocella®.

37.Bayer Corporation supplies BLI and Teva USA with the generic form of Yasmin®.

38.At all relevant times, Bayer performed all pharmacovigilance in connection with the

reporting of complaints and adverse events in association with the use of the PRODUCTS.

39.At all relevant times, Defendants included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns, and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

40.At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

41.At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third-parties, subsidiaries or related entities, the oral contraceptives, Yasmin®, Yaz® and/or Ocella®.

42.Defendants Bayer Corporation, Bayer Healthcare LLC, Bayer Pharmaceuticals Corporation, Bayer Healthcare Pharmaceuticals, Inc., Berlex Laboratories, Inc. and Berlex, Inc., Bayer Schering Pharma AG, Bayer AG, John Doe Manufacturers and Distributors DOES 1-100 shall be referred to herein individually by name or jointly as "Defendants."

43.Defendants John Doe Manufacturers (DOES 1-50, fictitious-name designations of one or more individuals, partnerships, corporations, and/or other entities whose actual identities have yet to be determined) at all times relevant hereto were in the business of developing, researching, selling, distributing, designing, manufacturing, testing, evaluating, licensing, labeling, marketing, and/or placing, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Yaz® into interstate commerce and derived substantial revenue from these activities.

44.Defendants John Doe Distributors (DOES 51-100, fictitious-name designations of one or more individuals, partnerships, corporations, and/or other entities whose actual

identities have yet to be determined) at all times relevant hereto were in the business of developing, researching, selling, distributing, designing, manufacturing, testing, evaluating, licensing, labeling, marketing, and/or placing, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Yaz® into interstate commerce and derived substantial revenue from these activities.

45. At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties, subsidiaries or related entities, the oral contraceptive, Yaz®.

46. At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

47. At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, aider and abettor, co-conspirator and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

## JURISDICTION

48. This Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1332, as there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## VENUE

49. Venue is proper in the Southern District of California pursuant to 28 U.S.C.A. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred within this district, including, but not limited to, the development, design, licensing,

labeling, manufacturing, advertising and/or marketing of the defective drug, as well as Defendants' fraud and conspiracy to actively conceal and/or misrepresent information concerning the safety and efficacy of Yaz®/ Ocella® /Yasmin® with the intention and specific desire to mislead the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff.

## STATEMENT OF FACTS

### YASMIN®, YAZ®, AND OCELLA® BACKGROUND

50.Defendants are the current market leaders in the oral contraceptive products, Yaz®, Yasmin®, and Ocella® (hereinafter referred to as “PRODUCTS”).

51.Plaintiffs bring this case against Defendants for damages associated with ingestion of the PRODUCTS, which were designed, manufactured, marketed and distributed by Defendants.

52.Yaz®, Yasmin®, and Ocella® are birth control pills. These PRODUCTS are combination oral contraceptives, or "COCs," meaning that they contain an estrogen component and a progestin component. These steroidal components work together in COCs to suppress ovulation, fertilization, and implantation, and thus prevent pregnancy.

53.Yasmin® first received FDA approval in 2001. It is a combination of the progestin, drospirenone, and the estrogen, ethinyl estradiol.

54.Ocella®, the generic version of Yasmin®, received FDA approval in March 2008.

55.All three versions of this birth control pill, Yasmin®, Yaz® and Ocella®, contain the progestin drospirenone which is a "fourth generation" progestin.

56.The estrogen component in Yasmin®, Yaz® and Ocella® is known as ethinyl estradiol.

57.The progestin component in Yasmin®, Yaz® and Ocella® is known as drospirenone.

58.Yasmin® and Ocella® contain 0.03 milligrams of ethinyl estradiol.

59. Yaz® contains 0.02 milligrams of ethinyl estradiol.

60. All three versions of this birth control pill, Yasmin®, Yaz® and Ocella®, contain 3 milligrams of drospirenone.

61. Yasmin®, Yaz® and Ocella® are different from other combined hormonal birth control pills in that they contain drospirenone, a progestin that is unlike other progestins available in the United States.

62. Drospirenone was not marketed in the United States prior to its use in Yasmin®.

63. Drospirenone is a diuretic and as such, creates unique risks as compared to other oral contraceptives.

64. Yaz® received FDA approval in 2006 and is essentially the same as Yasmin®, except there is a slightly smaller-amount of ethinyl estradiol (0.02 mg) in Yaz® and the dosing regimen is somewhat different. Yasmin® is delivered in a 21/7 dosing regimen, while Yaz® is delivered in a 24/4 dosing regimen.

65. On or about June 30, 2008, Bayer issued a "*Press Release Point*" announcing in relevant part:

> **Bayer concludes supply and licensing agreements for Yasmin® and Yaz® with Barr for the United States**
>
> Appeal of court decision invalidating Yasmin® patent will continue Further growth of Bayer's Women's Healthcare Business Unit expected
>
> **Berlin/Leverkusen, June 24, 2008 -** Bayer and Barr Laboratories Inc. today signed supply and licensing agreements for Yasmin® and Yaz® for the United States. Bayer will supply U.S. generics manufacturer Barr, starting July 1, 2008 at the latest, with a generic version of its oral contraceptive Yasmin, which Barr will market solely in the United States. Barr will pay Bayer a fixed percentage of the revenues from the product sold by Barr.
>
> Bayer will continue to pursue its appeal of a March 2008 New Jersey court's decision that invalidated Bayer's U.S. patent '531 for Yasmin. If Bayer prevails in its appeal, Bayer will receive a larger share of Barr's revenues from the product.
> "The agreements allow us to participate in the U.S. market for generic oral contraceptives in partnership with an established player," said Dr. Gunnar Riemann,

> Member of the Board of Management of Bayer HealthCare AG. "We expect our global Women's Healthcare business to continue posting high-single-digit to low-double-digit percentage annual growth rates in the coming years thanks to the products we already have on the market and to new, promising developmental products."
>
> It has also been agreed that Bayer will grant Barr a license to market a generic version of YAZ® like Yasmin, a product in the drospirenone family - in the United States starting July 1, 2011. Bayer will supply Barr with the product for this purpose. Should Bayer lose patent lawsuits in the United States against other companies concerning YAZ®, at that time Bayer will begin supplying the product to Barr and Barr will begin marketing generic YAZ® in the United States. Barr will pay Bayer a fixed percentage of the revenues from the product sold by Barr.
>
> The companies have agreed not to disclose further details of the agreements ...

66. On or about December 23, 2008, Teva acquired Barr and integrated Barr as a wholly owned subsidiary.

67. On April 1, 2009, Teva issued a Press Release announcing in relevant part:

> **Teva Announces Approval Of Generic Yaz® Tablets**
>
> **Jerusalem, Israel, April 1, 2009** - Teva Pharmaceutical Industries Ltd. (Nasdaq: TEVA) announced that the U.S. Food and Drug Administration has granted approval for the Company's Abbreviated New Drug Application (ANDA) to market its generic version for Bayer Healthcare Pharmaceuticals' oral contraceptive Yaz® (Drospirenone and Ethinyl Estradiol) Tablets. As the first company to file an ANDA containing a paragraph IV certification for this product, Teva has been awarded a 180-day period of marketing exclusivity.
>
> Annual sales of Yaz® were approximately $616 million in the United States for the twelve months that ended December 30, 2008, based on IMS sales data.
>
> In 2008, Teva's subsidiary Barr Pharmaceuticals, Inc. entered into a supply and licensing agreement with Bayer. Under this agreement, Teva has the right to launch an authorized generic version of Yaz® on July 1, 2011, or earlier in certain circumstances.

68.On June 24, 2008, BLI, which is now a wholly owned subsidiary of Teva USA, announced that it had entered into a supply and licensing agreement with Bayer for distribution of Ocella®, which is the generic version of Yasmin®. According to Bayer's Press Release, under the terms of that agreement, Bayer supplies Ocella® to Barr and Barr distributes Ocella® in the U.S. under the Barr Laboratories label.

69.According to IMS sales data, Ocella® had annual sales of approximately $170.2 million in the United States for the period ending December 31, 2008.

## THE "FOURTH GENERATION" PROGESTIN, DROSPIRENONE

70.Shortly after the introduction of COCs in the 1960s, doctors and researchers found that women using birth control pills had a higher risk of developing blood clots and suffering heart attacks and strokes than women not using the pill. As a result, the various brands of birth control pills were reformulated to reduce the amount of estrogen. As the amount of estrogen used was reduced, the risk of developing blood clots and suffering heart attacks and strokes was also reduced.

71.During the 1970s and 1980s, new progestins were developed which became known as "second generation" progestins (e.g., lovenorgestrel). These second generation progestins, when combined with a lower dose of the estrogen, helped to reduce the risk of developing blood clots and suffering heart attacks and strokes even further than the reduction of the estrogen dose alone. The second generation progestins were considered safer for women to use.

72.During the 1990s, new "third generation" progestins were developed. Unfortunately, these "third generation" progestins (e.g., gestodene and desogestrel) have been associated with a greater risk of the development of blood clots in deep veins (deep vein thrombosis or "DVT') and lungs (pulmonary embolism or "PE"), despite the fact that the amount of estrogen in those pills was kept low. As a result of this increased risk, the FDA required that products containing third generation progestins include a warning of the potentially higher risk of suffering a thromboembolic event.

73.The Products contain the same estrogen component, ethinyl estradiol, that has been used in the lower dose birth control pills for decades. However, drospirenone, this new type of progestin, is considered a "fourth generation" progestin. No other birth control pill contains drospirenone.

74.Drospirenone was not marketed in the United States prior to its use in Yasmin®. Drospirenone is an analog of the potassium sparing diuretic, spironolactone, and therefore, creates unique risks for its users as compared to other oral contraceptives.

75.COCs with Drospirenone carries a comparable degree of risk as those COCs with "third generation" progestin, but do not carry a warning label conveying the true increased risk.

76.In April 2010, after hundreds of serious adverse events had been reported, Bayer issued a new label for both Yaz® and Yasmin®. This new label continues to obscure the true risks associated with the products.

**OVER-PROMOTION OF YASMIN® AND YAZ®**

77.Defendants market Yasmin® and Yaz® as effective for the treatment of premenstrual dysphoric disorder (hereinafter referred to as "PMDD"), premenstrual syndrome (hereinafter referred to as "PMS") and moderate acne, in addition to its FDA-approved use as an oral contraceptive. Defendants marketed Yasmin® and Yaz® as providing the same efficacy as other birth control pills in preventing pregnancy, but with additional benefits.

78.Bayer markets Yasmin® and Yaz® as lacking certain side-effects, such as weight gain, bloating, and water retention, common to many other oral contraceptives.

79.However, because the PRODUCTS contain the drospirenone, which is a diuretic, these drugs present additional health risks not associated with other birth control pills.

68.Berlex Laboratories promoted Yasmin's® fourth generation progestin, drospirenone, by stating, *"Ask about Yasmin®, and the difference a little chemistry can make.*"

80.On July 10, 2003, the FDA objected to the characterization that drospirenone was beneficial as compared to the progestin used in other combined oral contraceptives and issued a warning letter stating: *"FDA is not aware of substantial evidence of substantial clinical experience demonstrating that Yasmin® is superior to other COCs or that the drospirenone in Yasmin® is clinically beneficial. On the contrary, FDA is aware of the added clinical risks associated with drospirenone* [.]"

81.The FDA's warning letter continued by stating that the advertisement failed *"to communicate that the potential to increase potassium is a risk"* or that *"increased serum potassium can be dangerous."*

82.More recently, Defendants advertised that its product Yaz® was indicated for treatment of premenstrual syndrome or "PMS," as opposed to the less serious condition of premenstrual dysphoric disorder or "PMDD."

83.Defendants also advertised that Yaz® contained the added benefit of preventing or reducing acne.

84. In one of Defendants' commercials cited by the FDA, the song *"We 're Not Gonna Take If'* plays in the background while a series of young, fashionably dressed women kick away or puncture floating signs with labels saying "irritability" and "feeling anxious." Meanwhile, a voiceover promotes Yaz® as a *"pill that goes beyond the rest, with benefits like the ability to maintain clear skin."*

85.Another one of the Defendants' commercials is set to the tune of *"Goodbye to You"* and shows a variety of women next to balloons marked *"headaches," "acne"* and

*"feeling anxious,"* which float away presumably after taking Yaz®.

86.On October 3, 2008, in response to these ads, the FDA issued another warning letter to Defendant Bayer for the misleading advertisement, reiterating that its marketing was misleading because it promoted Yaz® for medical conditions beyond the limits of the FDA approval, and adding that *"Yaz® has additional risks because it contains drospirenone … which can lead to hyperkalemia in high risk patients, which may result in potentially serious heart and health problems."*

87.The FDA further warned Defendants that Yaz® *"does not result in completely clear skin"* and that Defendants' *"TV Ads misleadingly overstate the efficacy of the drug."*

88.During 2008, when the ads in question were broadcast on television, Defendants' sales of Yaz® in the United States increased to approximately $616 million, from about $262 million in 2007. For 2008, Defendants' sales of Yasmin® totaled about $382 million, or about 11 percent of the United States market.

89.Indeed, the FDA felt Defendants' over-promotion of Yaz® was so severe that it required Bayer to run new TV advertisements to correct the previous misleading Yaz® advertisements regarding acne and premenstrual syndrome.

90.During 2008, when the ads in question were broadcast on television, Defendants' sales of Yaz in the United States increased to approximately $616 million, from about $262 million in 2007. For 2008, Defendants' sales of Yasmin® totaled about $382 million, or about 11 percent of the United States market.

91.In February 2009, Bayer Corporation settled 27 claims with Attorneys General across the country, including Pennsylvania Attorney General, Thomas W. Corbett, Jr., for misleading marketing and sales practices of Yaz® and Yasmin®. The litigation alleged that Defendant Bayer Corporation overemphasized the benefits and minimized the risks of Yaz® and Yasmin®.

92.In response, Bayer Corporation acknowledged that it was the proper party to resolve claims relating to the sales and marketing of Yaz® and Yasmin® and the Consent Order clearly bears the signature of George J. Lykos, the Senior Vice President, Chief Legal Officer and Secretary of Bayer Corporation. Mr. Lykos is the only person who signed the consent judgment on behalf of Bayer Corporation. Bayer Corporation ultimately agreed to spend at least $20 million on corrective TV advertisements and to submit al Yaz® advertisements over the next six years to the FDA for advanced screening.

93.In the corrective advertisements for Yaz® an actress states "You may have seen some Yaz commercials recently that were not clear," an actress says in the new corrective television spot, as she looks into the camera. "The F.D.A. wants us to correct a few points in those ads."

## DEFENDANTS' FRAUD AND FAILURES REGARDING PRODUCTS

94. Defendants did not provide adequate warnings to doctors, the health care community and the public about the risk of serious adverse events that are described in this

Complaint.

95. Defendants market Products as providing the same efficacy as other birth control pills in preventing pregnancy, but with additional benefits.

96. However, because Products contain fourth generation progestin drospirenone, they present additional health risks not associated with other birth control pills.

97. Defendants were aware that reliable and simple blood tests for inherited thrombophilias have been available that can screen patients most susceptible to the thrombotic effects of their Products. Yet, Defendants entirely failed to recommend that physicians utilize those tests before prescribing the PRODUCTS, thereby subjecting those most at risk of thromboembolic events to that risk, when those women could have entirely avoided the risk had the tests been recommended in the PRODUCTS' labeling.

98. Defendants were aware of the enhanced risk of utilizing their Products among patients who had undertook prolonged travel such as trans-continental flights, yet Defendants failed to warn the physicians and the patients that they should avoid such travel while on the product, or at a minimum, be cognizant of blood clot symptomatology while on or after such travels, so that preventative measures could be taken and prompt treatment of a developing clot could be obtained.

99. Defendants were aware of the substantially enhanced risk of utilizing their Products in patients who had orthopedic injuries that required their limb(s) to be casted, splinted or otherwise immobilized. Yet, Defendants failed to warn the physicians and patients that they should discontinue the PRODUCTS if the patient suffered an injury that required

immobilization.

100. Drospirenone can cause an increase in potassium levels in the blood. This can lead to a condition known as hyperkalemia (elevated blood potassium level).

101. Hyperkalemia can cause heart rhythm disturbances, such as extra systoles, pauses, or bradycardia; and more significantly, it can cause ventricular tachycardia or fibrillation-life threatening dysrhythmias. If left untreated, hyperkalemia can be fatal.

102. When hyperkalemia disrupts normal heart rhythms, the flow of blood through the heart is slowed to the point that it significantly decreases cardiac output, which may cause death. Blood clots in the coronary artery can lead to heart attacks. Blood clots in the legs can cause deep vein thromboses and may break off and travel to the lungs causing pulmonary emboli. Additionally, clots that travel to the brain can lead to a debilitating stroke.

103. The use of the PRODUCTS has harmful effects on blood plasma resulting in the development of thromboses, such as sinus thrombosis, pulmonary emboli, deep vein thrombosis, and portal vein thrombosis.

104. Drospirenone can also cause gallbladder disease and kidney stone formation which have been reported with the use of the PRODUCTS. As a result, surgical intervention is often required.

105. The use of the PRODUCTS has harmful effects on the gallbladder by increasing the cholesterol saturation of bile, which causes gallbladder disease.

106. Defendants have an ongoing duty of pharmacovigilance. As part of this duty, defendants are required to continually monitor, test, and analyze data regarding the safety, efficacy, and prescribing practices of their marketed drugs, including the PRODUCTS. Defendants continually receive reports from their own clinical trials, practicing physicians, individual patients and regulatory authorities concerning adverse events that occur in patients taking the PRODUCTS and defendants' other marketed drugs. Furthermore, defendants continue to conduct clinical trials for their marketed drugs long after the drug is approved for use. Defendants have a continuing duty to inform doctors, regulatory agencies, and the public of new safety and efficacy information they learn, or should have learned, about their marketed drugs once that information becomes available to defendants, whether through defendants' clinical trials, other outside sources or pharmacovigilance activities. Specifically, when defendants learn, or should have learned, of new safety information associated with their marketed drugs, they have a duty to promptly disseminate that data to the public. Defendants also have a continuing duty to monitor epidemiology and pharmacovigilance data regarding their marketed drugs and promptly report any safety concerns that arise through epidemiologic study or data.

107. During the brief time that the PRODUCTS have been sold in the United States, hundreds of reports of injuries and death associated with these products have been submitted to the FDA. The FDA's adverse event data indicates numerous serious adverse events have been associated with the PRODUCTS, including but not limited to heart

arrhythmias, electrolyte imbalance, hyponatremia, hyperkalemia, hyperkalemic arrhythmias, atrial fibrillation, tachycardia, bradycardia, myocardial infarction, strokes, transient ischemic attacks, blood clot formation, gall bladder and kidney disease and/or sudden death, and include serious injuries to women of childbearing age.

108. In fact, from the first quarter of 2004 through the third quarter of 2008, the FDA received reports for more than 50 deaths where the decedents were users of the PRODUCTS. Some of the deaths reported occurred in women as young as 17 years old.

109. Because of underreporting, the actual number of people who suffered side effects associated with these medications is expected to be 10 to 100 times more than reported.

110. Reports of elevated potassium levels are frequently included among the causes of death of women who died while using the PRODUCTS.

111. In April 2002, the *Medical Journal* reported that the Dutch College of General Practitioners recommended that older second-generation birth control pills should be prescribed instead of Yasmin®. *See* Sheldon, *Dutch GPs Warned Against New Contraceptive Pill,* BRIT. MED. J. 324:869 (April 13, 2002). This recommendation resulted from reports of 40 cases of venous thrombosis among women taking Yasmin®.

112. In February 2003, a paper entitled *"Thromboembolism Associated with the New Contraceptive Yasmin®"* was published in the *British Medical Journal. See* van Grootheest, et al., *Thromboembolism Associated with the New Contraceptive Yasmin®,* BRIT. MED. J. 326:257 (Feb. 1, 2003). The report detailed a Netherlands

Pharmacovigilance Centre report of five additional cases of thromboembolism, including two deaths where Yasmin® was suspected as the cause.

113. Two recent studies released in August 2009 found significantly increased risks of harm associated with Yasmin® or Yaz® over other types of birth control pills. The first study assessed the risk of developing venous thrombosis in women who use oral contraception. The women ranged in age from 15 to 49 and had no history of heart disease or any malignant condition. The study found that of the 3.3 million women taking oral contraceptives, there were 4,213 venous thrombotic events. Of this total, 2,045 occurred in women using drospirenone oral contraceptives. The study concluded that "oral contraceptives with ... drospirenone were associated with a significantly higher risk of venous thrombosis than oral contraceptives with levonorgestrel." Lidegard, *et al. "Hormonal Contraception and Risk of Venous Thromboembolism: National Follow Up Study,"* BRIT. MED. J. 330:B2921 (May 27, 2009).

114. The second study found that Yasmin® or Yaz® users have twice the risk of a clotting event than users of birth control pills that contain levonorgestrel. Vandenbroucke, *et al, "The Venous Thrombotic Risk of Oral Contraceptives, Effects of Estrogen Dose and Progestin Type: Results of the MEGA Case-Control Study,"* BRIT. MED. J. 339:B2921 (May 29, 2009).

115. As a result of Defendants' failure to provide marketing, advertising, and promotion materials that accurately warned of the serious risks of the PRODUCTS,

medical providers have prescribed and Plaintiffs ingested the PRODUCTS, thus causing Plaintiffs severe and permanent personal injuries.

116. Defendants have been warned at least three times by the FDA; in 2003, 2008, and 2009, for misleading the public through the use of ads which overstate the efficacy of Yaz and or its predecessor Yasmin, and minimize serious risks associated with the drug.

117. Despite the wealth of scientific evidence, Defendants not only ignored the increased risk of injuries and failed to convey the increased risks associated with use of the PRODUCTS, but through their marketing and advertising campaigns, they concealed the fact that the PRODUCTS carried greater risks than other equally efficacious birth control pills and urged women to take their products over those that present a safer alternative.

118. Defendants falsely and fraudulently represented to the medical and healthcare community, to Plaintiff, the FDA, and the public in general, that Products had been tested and found to be safe and/or effective for its indicated use.

119. These false representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general and the medical and healthcare community to recommend, dispense, purchase, and use the PRODUCTS despite the risks, all of which evinced a callous, reckless, willful,

depraved indifference to the health, safety, and welfare of Plaintiff.

120. Defendants knew and were aware or should have been aware that Products had not been sufficiently tested, was defective in its design and testing, and/or lacked adequate and/or sufficient warnings.

121. Defendants knew or should have known that Products had a potential to, could, and would cause severe and grievous injury and death to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate and/or down-played warnings.

122. In representations to Plaintiff, her healthcare providers, the public and/or the FDA, Defendants also fraudulently concealed and intentionally omitted the following material information:

a. That Products are not as safe as other available contraceptives;

b. That the risks of adverse events with the PRODUCTS (drospirenone and ethinyl estradiol) were higher than those of other available contraceptives;

c. That the risks of adverse events with Products were not adequately tested and/or known by Defendants;

d. Plaintiff was put at risk of experiencing serious and dangerous side effects including, but not limited to, stress, pulmonary embolisms, heart attacks, gallbladder complications, as well as other severe and personal injuries, physical pain and mental anguish;

e. That patients needed to be monitored more regularly than normal while using the PRODUCTS; and/or

f. That the PRODUCTS were designed, tested, manufactured, marketed, produced,

distributed and advertised negligently, defectively, fraudulently and improperly.

123. Defendants were under a duty to disclose to Plaintiff and her physicians, hospitals, healthcare providers and/or the FDA the defective nature of the PRODUCTS.

124. Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to person who used the PRODUCTS, including Plaintiff.

125. Defendants made the misrepresentations and/or actively concealed information concerning the safety and efficacy of the PRODUCTS with the intention and specific desire that the medical, pharmaceutical md/or scientific communities, and users and/or consumers of the drug, including Plaintiff, would rely on such in selecting the PRODUCTS as a contraceptive.

126. Defendants made these misrepresentations and/or actively concealed information concerning the safety and efficacy of the PRODUCTS in their labeling, advertising, product inserts, promotional material or other marketing efforts.

127. The misrepresentations of and/or active concealment by Defendants were perpetuated directly and/or indirectly by Defendants, its sales representative, employees, distributors, agents and/or detail persons.

128. Defendants knew that Plaintiff, her healthcare providers, the public, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the PRODUCTS, as set forth herein.

129. The misrepresentations of and/or active concealment by Defendants constitute a continuing tort. Indeed, through Defendants' product inserts, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the PRODUCTS.

130. Moreover, Defendants had a post-sale duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, about the potent risks and serious side effects associated with the use of the PRODUCTS in a timely manner, yet they failed to provide such warning.

131. Defendants' failure to convey complete safety information or follow up on the known increased risks associated with the use of the PRODUCTS and their concealment of those increased risks from the FDA, other product users, and the medical community constitute fraudulent concealment that equitably toll the applicable statutes of limitations.

132. As a result, Plaintiff could not have commenced this action previously because both the injury and the fact that it was caused by the conduct of another were not known or discoverable through the exercise of reasonable diligence.

133. Indeed, Plaintiff could not have commenced this suit sooner as technical, scientific or medical knowledge and information sufficient to ascertain the case of injury, which was uniquely in the possession of Defendants, had not been discovered, identified or determined in the public literature prior to the time period within which this action would have been authorized.

134. Defendants are estopped from relying on the statute of limitations defense because Defendants actively failed to convey, obscured and actively concealed the increased risks associated with the PRODUCTS by, among other things, suppressing reports and failing to disclose increased risks to physicians. Instead of revealing the increased risks, Defendants have continued to represent the PRODUCTS as safe for their

intended use.

135. Had Plaintiffs known the full extent of the risks and dangers associated with the use of the products, Plaintiffs would never have used the products and incurred the injuries they did.

136. *As* a result of the manufacture, marketing, advertising, promotion, distribution, and the sale of the PRODUCTS without adequate warnings about the risks of serious injuries, Plaintiff has sustained severe and permanent personal injuries.

137. As a result of Defendants' claim regarding the effectiveness and safety of the PRODUCTS, Plaintiff's medical providers prescribed, and Plaintiff ingested the PRODUCTS.

138. As a direct and proximate result of Defendants' negligence, suppression, concealment of information, and other wrongful conduct, and the unreasonably dangerous and defective characteristics of the PRODUCTS, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future. Plaintiff has suffered and will continue to suffer economic losses and have otherwise been physically, emotionally, and economically injured. Plaintiff is entitled to compensatory damages from Defendants as a result of their wrongful, callous, and careless concealment.

**FACTS REGARDING PLAINTIFF YULIYA KORCHNOY**

139. Plaintiff YULIYA KORCHNOY (referred to by name or as "Plaintiff'), who was born on March 3rd, 1970, is an individual who is a citizen of the State of California, residing therein in San Diego County.

140. Plaintiff is married to Andrey Korchnoy, who also resides in the State of California, in the county of San Diego.

141. On or about July 22, 2023, Plaintiff suffered a stroke as a direct result of ingesting the PRODUCTS.

142. Plaintiff was first hospitalized for and diagnosed with the stroke at the Veterans Affairs San Diego Medical Center on or about July 22, 2023. Thereafter, Plaintiff has been consistently seen by multiple neurologists and undergoes Physical Therapy to manage her post-stroke treatment and entirely different lifestyle considering her new physical restrictions resulting from the stroke.

143. Plaintiff was prescribed Yaz® by her health care provider in the state of California for the purpose of birth control. Plaintiff ingested Yaz® from early 2007 until sometime in December 2022 when she stopped taking it for approximately two months. Plaintiff resumed taking Yaz® in early 2023 until she was admitted to the hospital with a stroke on July 22, 2023.

144. Plaintiff was told that Yaz® was a birth control drug by both her Primary Care Physician and her OBGYN.

145. Plaintiff took the brand name Yaz® until just a few years ago when her

insurance switched it out to Ocella®, however, she was told that Ocella® was the generic version of Yaz® and therefore the exact same drug.

146. Plaintiff justifiably relied on and/or was induced by the misrepresentations and/or active concealment of Defendants to purchase and ingest Yaz®/Ocella® to her detriment.

147. As a result of using Defendants' product Yaz®/Ocella®, Plaintiff sustained serious side effects including, but not limited to, a stroke in the summer of 2023, ongoing physical pain, diminished cognition, mental anguish, diminished enjoyment of life, significant lifestyle changes, permanent scarring, medical, health, incidental and related expenses, medical monitoring and/or medications, and the fear of developing additional health consequences.

148. Plaintiff did not discover, nor did she have any reason to discover that her injury was a result of a defective drug and/or the wrongful conduct of Defendants, as set forth herein, until at least late 2023.

## CLAIMS FOR RELIEF

149. Plaintiffs reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

150. At the time of Plaintiff's injuries, Defendants' pharmaceutical drugs, the PRODUCTS, were defective and unreasonably dangerous to foreseeable consumers, including Plaintiff.

151. Plaintiff was prescribed, purchased and was injured as a result of ingestion of the PRODUCTS in California. As a result, Plaintiff put Defendants on notice of the following claims arising under California Law.

**COUNT I**
**(Fraudulent Concealment)**

152. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges on information and belief as follows.

153. Prior to Plaintiff's use of the PRODUCTS and during the period in which Plaintiff actually used the PRODUCTS, Defendants fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS, including information regarding increased adverse events, pre and post marketing deaths, a high rate of severe adverse event reports compared to other birth control pills. Furthermore, Defendants fraudulently concealed the safety information about the use of drospirenone, the only birth control pill using this ingredient. As described above, drospirenone has several well-known serious side effects that are not seen in other forms of birth control. Plaintiff believes that the fraudulent misrepresentation described herein was intentional to keep the sales volume of the PRODUCTS strong.

154. Defendants knew or should have known that the PRODUCTS were being used to treat menstrual symptoms including but not limited to, heavy menstrual bleeding, painful menstrual periods, irregular menstrual periods, and premenstrual dysphoric disorder.

155. Defendants fraudulently concealed safety issues with the PRODUCTS in order to induce physicians to prescribe and patients, including Plaintiff, to purchase and use the PRODUCTS.

156. At the time Defendants concealed the fact that the PRODUCTS were not safe, Defendants were under a duty to communicate this information to physicians, the

FDA, the Healthcare community, and the general public in such a manner that they could appreciate the risks associated with using the PRODUCTS.

157. Plaintiff and the Plaintiff's prescribing doctor relied upon the Defendants' outrageous untruths regarding the safety of the PRODUCTS.

158. As a direct and proximate result of Defendants' malicious and or intentional concealment of material life altering information from Plaintiff and Plaintiff's prescribing doctor, Defendants caused or contributed to Plaintiff's injuries.

159. It is unconscionable and outrageous that Defendants would risk the lives of consumers. Despite this knowledge, the Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct rises to the level necessary that Plaintiff should be awarded punitive damages to deter Defendants from this type of outrageous conduct in the future and to discourage Defendants from placing profits above the safety of patients in the United States of America.

160. Defendants' fraudulent concealment tolled the statute of limitations because only Defendants knew the true dangers associated with the use of the PRODUCTS as described herein. Defendants did not disclose this information to the Plaintiff, the prescribing doctor, the Healthcare community and the general public.

## COUNT II

**(Strict Liability)**

161. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges on information and belief as follows.

162. At the time of Plaintiff's injury, Defendants' pharmaceuticals, the PRODUCTS, were defective and unreasonably dangerous to foreseeable consumers, including Plaintiff.

163. The Products used by Plaintiff were in the same or substantially similar condition as it was when it left the possession of Defendants.

164. Plaintiff did not misuse or materially alter the PRODUCTS.

165. Defendants are strictly liable for Plaintiff's injury in the following ways:

a. The pharmaceutical Products were designed, manufactured, sold and/or supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

b. Defendants failed to properly market, design, manufacture, distribute, supply and sell the PRODUCTS;

c. Defendants failed to warn and/or place adequate warnings and instructions on the PRODUCTS;

d. Defendants failed to adequately test the PRODUCTS;

e. Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of the PRODUCTS; and

f. A feasible alternative design existed that was capable of preventing Plaintiffs injury.

166. Defendants' actions and omissions were the direct and proximate cause of Plaintiffs injury.

167. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

**COUNT III**

**(Breach Of Implied Warranty Of Merchantability)**

168. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges on information and belief as follows.

169. At the time Defendants marketed, distributed and sold Yaz®/Ocella® to Plaintiff, Defendants knew of the intended, reasonably foreseeable and/or ordinary use of the drug and warranted that the PRODUCTS were merchantable, safe and fit for such use.

170. Members of the consuming public, including consumers such as Plaintiff, were intended third party beneficiaries of the warranty.

171. the PRODUCTS were not merchantable or safe or fit for its intended, reasonably foreseeable and/or ordinary purpose, because it has a propensity to lead to the serious personal injuries described in this complaint.

172. Plaintiff, in ingesting the PRODUCTS, reasonably relied upon the skill and judgment of Defendants as to whether the PRODUCTS were of merchantable quality and safe for its intended, reasonably foreseeable and/or ordinary use.

173. Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiff's injury.

174. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT IV

**(Breach Of Implied Warranty Of Fitness For A Particular Purpose)**

175. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges on information and belief as follows.

176. Defendants sold the PRODUCTS with an implied warranty that it was fit for the particular purposes of safe birth control, and to provide other benefits, such as reduced bloating, reduced mood swings, improved complexion, and reduced severity of symptoms accompanying menstruation.

177. Members of the consuming public, including Plaintiff, were intended third party beneficiaries of the warranty.

178. the PRODUCTS were not fit for the particular purpose of a safe birth control pill and other known benefits without serious risk of personal injury, which risk is much higher than other birth control pills.

179. Plaintiff reasonably relied on Defendants' representations that the PRODUCTS were safe and effective for use as a birth control method and other known uses.

180. Defendants' breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiff's injury.

181. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT V

**(Negligent Failure To Warn)**

182. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

183. Before Plaintiff used the PRODUCTS, and during the period in which she used it, Defendants knew or had reason to know that the PRODUCTS were dangerous and created an unreasonable risk of bodily harm to consumers.

184. Defendants had a duty to exercise reasonable care to warn end users of the dangerous conditions or of the facts that made the PRODUCTS likely to be dangerous.

185. Despite the fact that Defendants knew or had reason to know that the PRODUCTS were dangerous, Defendants failed to exercise reasonable care in warning the medical community and consumers, including Plaintiff, of the dangerous conditions and facts that made the PRODUCTS likely to be dangerous.

186. The Plaintiff's injury was a direct and proximate result of Defendants' failure to warn of the dangers of the PRODUCTS.

187. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT VI

**(Negligence)**

188. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

189. Defendants had a duty to exercise reasonable care in the manufacture, sale and distribution of the PRODUCTS, including a duty to assure that the product did not cause unreasonable, dangerous side effects to users.

190. Defendants failed to exercise ordinary care in the manufacture, sale, warnings, quality assurance, quality control, and distribution of the PRODUCTS, in that Defendants knew or should have known that the drug created a high risk of unreasonable harm.

191. Defendants were negligent in the design, manufacture, advertising, warning, marketing and sale of the PRODUCTS, in that, among other things, they:

a. Failed to use due care in designing and manufacturing the PRODUCTS so as to avoid the aforementioned risks to individuals;
b. Failed to accompany the drug with proper warnings regarding all possible adverse side effects associated with its use, and the comparative severity and duration of such adverse effects. The warnings given did not reflect accurately the symptoms, scope or severity of the side effects;
c. Failed to provide adequate training and instruction to medical care providers for appropriate use of the PRODUCTS;
d. Encouraged the drug's misuse and overuse while failing to disclose the severity of the side effects of the drug to the medical, pharmaceutical and scientific communities and users, including plaintiff, in order to maximize profit from sales.
e. Placed an unsafe product into the stream of commerce; and
f. Were otherwise careless or negligent.

192. Despite the fact that Defendants knew or should have known that the PRODUCTS caused unreasonable, dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market the PRODUCTS to consumers, including the medical community and Plaintiff.

193. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## **COUNT VII**

### **(Negligent Misrepresentation)**

194. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows. Prior to Plaintiff first using the PRODUCTS and during the period in which she used the PRODUCTS, Defendants misrepresented that the PRODUCTS were a safe and effective as a means of birth control and for other known uses. Defendants also failed to disclose material facts regarding the safety and efficacy of the PRODUCTS, including information regarding increased adverse events, harmful side effects, and results of clinical studies showing that use of the medication could be life threatening.

195. Defendants had a duty to provide Plaintiff, physicians, and other consumers with true and accurate information and warnings of any known risks and side effects of the pharmaceuticals they marketed, distributed and sold.

196. Defendants knew or should have known, based on their prior experience, adverse event reports, studies and knowledge of the efficacy and safety failures with the PRODUCTS, that their representations regarding the PRODUCTS were false, and that they had a duty to disclose the dangers of Yaz®.

197. Defendants made the representations and failed to disclose the material facts with the intent to induce consumers, including Plaintiff, to act in reliance by purchasing the PRODUCTS.

198. Plaintiff justifiably relied on Defendants' representations and nondisclosures by purchasing and using the PRODUCTS.

199. Defendants' misrepresentations and omissions regarding the safety and efficacy of the PRODUCTS were the direct and proximate cause of Plaintiff's injuries.

200. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT VIII

### (Breach Of Express Warranty)

201. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

202. Through aggressive marketing and advertising campaigns, Defendants expressly warranted that the PRODUCTS were safe and effective to members of the consuming public, including Plaintiff.

203. Members of the consuming public, including consumers such as Plaintiff, were intended third party beneficiaries of the warranty.

204. Defendants marketed, promoted and sold the PRODUCTS as a safe for birth control and other known uses.

205. the PRODUCTS does not conform to these express representations because the PRODUCTS are not safe and has serious side effects, including death.

206. Defendants breached their express warranty in one or more of the following ways:

a. the PRODUCTS, as designed, manufactured, sold and/or supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

b. Defendants failed to warn and/or place adequate warnings and instructions on the PRODUCTS;

c. Defendants failed to adequately test the PRODUCTS; and

d. Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from the PRODUCTS.

207. Plaintiff reasonably relied upon Defendants' warranty that the PRODUCTS were safe and effective when she purchased and used the medication.

208. Plaintiff's injuries were the direct and proximate result of Defendants' breach of their express warranty.

209. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT IX

**(Fraudulent Misrepresentation)**

210. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

211. Defendants, having undertaken the manufacturing, marketing, prescription, dispensing, distribution and promotion of the PRODUCTS, owed a duty not to deceive

the Plaintiff, her health care providers and the public regarding the character, safety, quality and/or effectiveness of their drug.

212. The duty not to deceive is distinct from than the duty to warn.

213. Since the drug's approval in April of 2001, and on multiple occasions to the present date, Defendants fraudulently misrepresented and published information in various forms of media (including, but not limited to, ad campaigns, television, internet, etc.) regarding their product's character, safety, quality and/or effectiveness, including, but not limited to, the public ad campaigns which were the subject of the FDA's 2003, 2008 and 2009 warnings.

214. At the time of Defendants' fraudulent misrepresentations, Plaintiff was unaware and ignorant of the falsity of the statements and reasonably believed them to be true.

215. Defendants breached their duties to Plaintiff by providing false, incomplete and misleading information regarding Yaz®.

216. Defendants acted with deliberate intent to deceive and mislead Plaintiff, her medical providers, and the public.

217. Plaintiff reasonably relied upon Defendants' deceptive, inaccurate and fraudulent misrepresentations.

218. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff suffered the harm described herein.

219. Defendants' conduct was committed with knowing, conscious, wanton, willful and deliberate disregard for the value of human life and the rights and safety to patients/consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

**<u>COUNTS X-XI</u>**

**(Civil Conspiracy And Commercial Bribery)**

220. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

221. Defendants committed civil conspiracy, commercial bribery and conspiracy to commit commercial bribery in that fiduciaries of Defendants knowingly and/or intentionally offered, conferred, or agreed to confer benefits, gifts, and/or gratuities or conspired to do the same upon physicians, pharmacists, and insurance companies for the purpose of enticing these entities to use the drugs the PRODUCTS, and to convince their patients and others of the safety and effectiveness of the PRODUCTS.

**<u>COUNT XII</u>**

**(Loss Of Consortium)**

222. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

223. Plaintiff Andrey Korchnoy brings this cause of action for Loss of Consortium.

224. By reasons of the injuries sustained by his spouse, Plaintiff Yuliya Korchnoy, Plaintiff Andrey Korchnoy has been and will continue to be deprived of consortium, society, comfort, protection, and service, thereby causing and continuing to cause grief, sorrow, mental anguish, emotional distress, pain and suffering.

**<u>COUNT XIII</u>**

**(Punitive Damages)**

225. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

226. Defendants engaged in fraudulent and malicious conduct towards the Plaintiff, her medical providers and the public, and thereby acted with willful and wanton and/or conscious and reckless disregard for the safety of Plaintiff and the public, thereby entitling her to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants, jointly and severally, as follows:

A. For an award of compensatory damages, including damages against Defendants and each of them for personal injuries, medical and hospital expenses, loss of income, loss of consortium, and other damages according to proof at trial in excess of $75,000;
B. For an award of punitive or exemplary damages against Defendants and each of them in excess of $75,000;
C. For reasonable attorneys' fees and costs;
D. For pre-judgment interest; and
E. For such further and other relief the court deems just, equitable, and proper.
F.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all triable issues.

Dated: March 19, 2025

Respectfully submitted,
**MCCUNE LAW GROUP**

By: *s/Kristy M. Arevalo*
Kristy M. Arevalo

Attorney for Plaintiffs
Yuliya Korchnoy and Andrey Korchnoy
Email: kma@mccunelawgroup.com